# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ADREAN L. SMITH,
          Petitioner,

v.                                                                           Case No. 15-C-1235

GARY BOUGHTON, Warden,
          Respondent.

## DECISION AND ORDER

In 2011, Adrean Smith pleaded guilty in Milwaukee County Circuit Court to three counts of armed robbery, as party to a crime, and one count of first degree reckless injury by use of a dangerous weapon. The circuit court sentenced Smith to a total of twenty-five years of initial confinement and ten years of extended supervision. In state court, Smith challenged the admissibility of statements he made to detectives during an interrogation on the ground that they had been obtained after he invoked his right to remain silent. The state courts, including the Wisconsin Supreme Court, rejected Smith's challenge to the statements' admissibility. *See State v. Cummings*, 357 Wis. 2d 1 (2014).[1] Smith now seeks a writ of habeas corpus under 28 U.S.C. § 2254.

## I. BACKGROUND

In November 2010, while investigating a series of armed robberies involving a stolen van, Detective Travis Guy conducted a custodial investigation of Adrean Smith. At the beginning of the interrogation, the detective advised Smith of his rights under

---

[1] The Wisconsin Supreme Court consolidated Smith's appeal with the appeal of Carlos Cummings, and its opinion was issued with the caption of Cummings's appeal listed first. Thus, citations to *State v. Cummings* refer to the Wisconsin Supreme Court's decision in Smith's appeal.

*Miranda v. Arizona*, 384 U.S. 436 (1966). Smith agreed to waive those rights and make a statement. The statement was audio recorded. The parties have filed a disc containing three audio files. *See* ECF No. 9. Each file consists of a part of Guy's interrogation of Smith. (The parties have also filed a second disc that contains a single, lengthy audio recording. This recording is of a statement that Smith gave to a different detective following his interrogation by Guy.)

In the first part of the interrogation, Detective Guy administers Smith his *Miranda* rights and Smith agrees to make a statement. Guy then questions Smith about the circumstances that resulted in his arrest, namely, Smith's running from police after an unmarked police vehicle pulled over a van he was driving. The van was stolen, and Guy asked Smith how he came to be driving a stolen van. Guy continued to question Smith about the stolen van and why he fled from the police for about 10 minutes, at which point they took a break.

After the break, the following exchange took place:

> Detective Guy: . . . [Y]ou said you was gonna talk about what you did but not anybody else. So I'll let you talk and I'll talk about these two things when you get done. Is that cool? Alright.
>
> Smith: What [unintelligible] talk about?
>
> Detective Guy: I dunno, you told me, you said that, uh, you was going to talk about . . . what was going on with you but you're not going to bring them—

At this point, Smith said "the van" and began talking about having been caught in the stolen van:

> Smith: The van was stolen. I didn't steal the van. It got stolen. But I got caught in the van. So, I'm gonna play my role. I'm a, you know what I'm sayin', whatever damage was done to the van, I'm do

2

|  |  |
|---|---|
| | whatever I can to make sure that whoever owns the van gets their money back. Or— |
| Detective Guy: | Was there damage to the van? |
| Smith: | Yeah. There was damage to the ignition. |
| Detective Guy: | Okay. But after that? |
| Smith: | Nah, I didn't do it. But I'm the one who got caught drivin' it. [Unintelligible] might as well say. |
| Detective Guy: | But you didn't know it was stolen when you drove it? |
| Smith: | No, I ain't stole it. I ain't steal no van. |
| Detective Guy: | [Unintelligible] you know who stole it. If the— |
| Smith: | Yeah, I know it was stolen. |
| Detective Guy: | Did you steal the van? |
| Smith: | No, I didn't steal the van. And so, and that's what I'm saying . . . if anything, if I get out, I make sure that I take care of my responsibilities and I get my priorities straight, and start, which is, get a job, and pay whoever the van that was, the damage that was done. But, um, if anything, I would like to talk to the victims of the van, 'cause I want to tell them face-to-face, so they can see me and they can understand me more, or if they don't want to talk I would want them to show up at court. But, whatever happens, I just want them to know that I'll be responsible for payin' for the damages. |

Smith then asked the detective: "Okay, so what else do you want to know about the van?" When Guy said he just wanted to let Smith talk, Smith responded: "See, I don't know what to say. What I'm sayin' is I got caught in a van that's, that's pretty much all I can say."

At this point, Detective Guy then began talking about a robbery:

|  |  |
|---|---|
| Detective Guy: | . . . . Okay, alright, um, we're going to talk about this incident here, okay? This is Milwaukee Police Incident number 1032710—correction, 0130, which is |

3

> an armed robbery, attempted home invasion. This happened on 7205 West Brentwood, okay? In this incident here, a woman was approached in her side drive, okay? On here it says that actors intentionally removed the victim's purse, okay? The victim pulled in a driveway, and one of the suspects was armed with a handgun, a silver and chrome handgun. And then the actors pointed the gun at the victim and took her purse. Now she was getting out of her vehicle—

Here, Smith interrupted the detective, and the following exchange occurred:

| | |
|---|---|
| Smith: | See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this. |
| Detective Guy: | Okay. |
| Smith: | I don't know nothing. See, look, I'm talking about this van. I don't know nothing about no robbery. Or no—what's the other thing? |
| Detective Guy: | Hmmm? |
| Smith: | What was the other thing that this is about? |
| Detective Guy: | Okay. |
| Smith: | I don't want to talk . . . I don't know nothing about this, see. That's—I'm talking about this, uh, van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this. |
| Detective Guy: | I got a right to ask you about it. |
| Smith: | Yeah, you got a right but— |
| Detective Guy: | You know what I mean? |
| Smith: | —I don't know nothing about it. I don't know nothing about this. I'm here for the van. |
| Detective Guy: | You're here for some other things that we're going to talk about, so I'm not finished yet. You don't know anything about this robbery that happened at 7205 West Brentwood Avenue— |
| Smith: | Nah— |

4

| Detective Guy: | —on the 23rd of November— |
| --- | --- |
| Smith: | Nah— |
| Detective Guy: | —where a woman was approached? |
| Smith: | Uh-uh. I don't know nothing about this. |

After this exchange and Smith's making a brief reference to a cell phone, Detective Guy returned to questioning Smith about the stolen van. Guy and Smith talked about the van for about five more minutes. Detective Guy then asked Smith about another robbery, one that occurred on a street named Bobolink. Smith replied, "What I got to do with it? What that got to do with me? I don't know nothing about no robbery, see, that's what I'm saying! I don't rob people." Detective Guy then shifted the conversation to Smith's cell phone and some pictures of him holding a gun. Eventually, Smith asked Guy if he thought that because he had a gun he committed the robberies. Guy told Smith that another suspect he had interviewed admitted to committing a robbery with Smith. Guy spent the next 15 to 20 minutes trying to convince Smith that the police already had enough evidence to convict him of something, and that it would be in his best interest to cooperate with the investigation concerning the robberies. Smith continued to deny that he was involved in the robberies. The parties then took a second break.

The third recorded part of the interrogation begins with Smith confessing to committing an armed robbery. In subsequent interrogations, Smith admitted to being involved with other robberies, burglaries, and shootings.

After the interrogations, the State of Wisconsin charged Smith with seven counts of armed robbery, two counts of attempted armed robbery, three counts of being a delinquent in possession of a firearm, two counts of burglary with a dangerous weapon,

5

two counts of false imprisonment with a dangerous weapon, one count of first degree reckless injury with a dangerous weapon, and one count of operating a motor vehicle without the owner's consent.

Smith filed a motion to suppress the statements he made to Detective Guy regarding the robberies. Smith argued that once Guy inquired about a robbery, Smith unequivocally invoked his right to "cut off questioning," see *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975), and thus any statement Smith made after that point was inadmissible. The trial court denied the motion to suppress, and Smith eventually pleaded guilty to three counts of armed robbery and one count of first degree reckless injury. On appeal, Smith again argued that when Detective Guy brought up the robberies, Smith unambiguously invoked his right to curt off questioning. The Wisconsin Court of Appeals rejected this argument and affirmed Smith's conviction.

The Wisconsin Supreme Court granted Smith's petition for review and decided Smith's case together with a companion case, *State v. Cummings*. The Wisconsin Supreme Court affirmed, finding that Smith's request to remain silent was ambiguous. The court reasoned as follows:

> Smith argues that his statement—"See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this."—in response to Detective Guy's questions constituted an unequivocal invocation of his right to remain silent. Smith further notes that he repeated his assertion that he didn't want to talk three different times within the space of just a few sentences.
>
> We agree that, standing alone, Smith's statements might constitute the sort of unequivocal invocation required to cut off questioning, and we further acknowledge that Smith's statement presents a relatively close call. In the full context of his interrogation, however, Smith's statements were not an unequivocal invocation of the right to remain silent.

6

When placed in context it is not clear whether Smith's statements were intended to cut off questioning about the robberies, cut off questioning about the minivan, or cut off questioning entirely. Some of Smith's statements are also exculpatory statements or assertions of innocence, which do not indicate a desire to end questioning at all. Prior to Smith's statement, Detective Guy had been asking Smith about his involvement in the theft of the minivan. Smith had been participating in this portion of the questioning in a fairly straightforward and cooperative fashion.

When the topic of the armed robberies came up, Smith stated, "I don't want to talk about this" four times, but also stated, "I don't know nothing about this" a total of seven times. In some instances Smith seems to mean the van when he uses the words "this" or "that," but in other instances it seems he means the robberies. In listening to the recording of the interrogation, it seems that he meant to refer to the robberies but this is not the only interpretation.

Further, while "I don't want to talk about this" seems to indicate a desire to cut off questioning, "I don't *know* nothing about this" is an exculpatory statement proclaiming Smith's innocence. Such a proclamation of innocence is incompatible with a desire to cut off questioning.

Given the apparent confusion, and although he was not required by law to do so, Detective Guy gave Smith an opportunity to clarify his statements when he asked, "Do you want to tell me about [the robberies]?" In response, Smith again proclaimed his innocence, stating: "I don't know nothing about no robbery, see, that's what I'm saying! I don't rob people."

Smith's own words also indicated a continued willingness to answer questions. Following the statement that Smith emphasizes—"See, I don't want to talk about, I don't want to talk about this. I don't know nothing about this."—Smith also stated: "I'm talking about this van. This stolen van. I don't know nothing about this stuff . . . I don't know nothing about this. I'm here for the van." These additional statements indicate that Smith was willing to continue answering questions about the van, but was unwilling, or perhaps unable, to answer questions about the robberies.

"[A] defendant may selectively waive his *Miranda* rights, deciding to 'respond to some questions but not others.'" *State v. Wright*, 196 Wis.2d 149, 156 (Ct.App.1995) (quoting *Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir.1988)). Such selective "refusals to answer specific questions," however, "do not assert an overall right to remain silent." *Id.* at 157 (citing *Fare v. Michael C.*, 442 U.S. 707, 726–27 (1979)).

Finally, our determination regarding the meaning of Smith's statement need not be definitive to conclude that he did not unequivocally invoke the

right to remain silent. The mere fact that Smith's statements *could* be interpreted as proclamations of innocence or selective refusals to answer questions is sufficient to conclude that they are subject to "reasonable competing inferences" as to their meaning.

Thus, under the facts and circumstances of the case at issue, Smith did not unequivocally invoke his right to remain silent, such that police were required to cut off their questioning. We therefore affirm the court of appeals.

*Cummings*, 357 Wis. 2d at 26–28 (citation omitted).

## II. DISCUSSION

In seeking a writ of habeas corpus, Smith contends that he unambiguously invoked his right to cut off questioning when he told Detective Guy "I don't want to talk about this." He contends that the Wisconsin Supreme Court's conclusion to the contrary involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court promulgated a set of safeguards to protect the constitutional rights of persons subjected to custodial police interrogation, including the right to remain silent and the right to an attorney. The Court held that unless law enforcement officers give certain specified warnings before questioning a person in custody and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him at trial. In the present case, the parties agree that, at the outset of the interrogation, Detective Guy administered proper *Miranda* warnings to Smith and that Smith validly waived his right to remain silent and his right to an attorney.

The issue in this case concerns a different aspect of the *Miranda* decision, which sets out what happens if a suspect who receives *Miranda* warnings and agrees to make

8

a statement subsequently indicates that he does not want to answer further questions. The Court in *Miranda* stated as follows:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473–47 (footnote omitted). In *Michigan v. Mosley*, the Court discussed this aspect of the *Miranda* decision and stated that "[t]he critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.'" 423 U.S. at 103. The Court continued:

> Through the [suspect's] exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 103–04 (footnote omitted). Subsequently, the Supreme Court held that, for a suspect to invoke his right to cut off questioning, he must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010).

The issue in the present case is whether Smith unambiguously invoked his right to cut off questioning immediately after Detective Guy brought up the subject of the robbery. Before proceeding, however, I want to make clear that Smith does not argue, in the alternative, that he at least unambiguously invoked a right to cut off further questioning about the robberies. That is, Smith does not contend that if he did not

9

validly invoke his right to remain silent on all matters, he at least unambiguously informed Detective Guy that he did not want to talk about the robberies, and that therefore Detective Guy's continuing to question him about the robberies violated his federal rights, even if further questions about the van or other topics would have been allowed. Nor did Smith raise an alternative argument along these lines in state court. This may be because the Wisconsin courts have drawn a distinction between a suspect's declining to answer questions on a certain topic, on the one hand, and invoking a right to cut off all questioning, on the other. When discussing Smith's case, the Wisconsin Supreme Court stated that "[a] defendant may selectively waive his *Miranda* rights, deciding to respond to some questions but not others." *Cummings*, 357 Wis. 2d at 28. But it also stated that it did not view a selective waiver as the equivalent of asserting "an overall right to remain silent." *Id.* The court thus implied that a suspect does not have a right to cut off questioning on just a certain topic or topics; rather, unless the suspect invokes his right to cut off questioning altogether, the law-enforcement officer may continue to ask him questions on any topic, and it will be up to the suspect to refuse to answer any questions that fall outside the scope of his selective waiver. *See also* Pet'r's Br. at 7 (recognizing that Wisconsin Supreme Court reasoned that "the right to silence cannot be invoked as to only certain questions"). Again, Smith does not challenge this aspect of the court's decision.

I also want to make clear that Smith does not bring a separate claim based on Detective Guy's statement that he had a "right" to ask Smith about the robbery. Because under *Miranda* Smith at all times had the right to cut off questioning, Guy's statement about having a right to ask him further questions was arguably false and

arguably had the effect of undermining the *Miranda* warnings that Guy had previously administered.  But Smith does not contend that this "reverse *Miranda*" warning itself constituted a violation of his rights.  To be sure, Smith contends that Guy's statement about having a right to ask questions was unconstitutional because it came after Smith unambiguously invoked his right to cut off questioning.  But he does not contend that Guy's claiming a right to ask questions was unconstitutional because it was false and undermined the *Miranda* warnings.  Nor did Smith raise a separate claim in state court based on Guy's claiming a right to ask questions.

Turning, then, to the only issue presented, I conclude that the Wisconsin Supreme Court did not unreasonably apply federal law in finding that Smith did not unambiguously invoke his right to cut off questioning on all topics.  When Detective Guy first began to ask about one of the robberies, Smith interrupted him.  But Smith did not interrupt to say that he was done talking, that he did not want to talk anymore, or use any other language indicating that he wanted the interrogation to stop.  Rather, he said that he did not want to talk "about this."  Stating that one does not want to talk "about" something implies that the person does not want to talk about a particular topic. Moreover, "this," when used as a pronoun in the manner that Smith used it, generally refers to the topic most recently mentioned.  *See Oxford English Dictionary* (online edition) (defining "this" as "[i]ndicating a thing or person present or near (actually in space or time, or ideally in thought, esp. as having just been mentioned and thus being present to the mind)"). Because Smith interrupted Detective Guy as he was changing the subject to the robbery, the most natural interpretation of his interjection is that he did

11

not want to talk about the robbery, as opposed to the other matters that had been under discussion until Guy brought up the robbery.

Indeed, it would be highly unusual for an ordinary user of the English language to express a desire to end all conversation on any topic by stating "I don't want to talk about this" in response to a questioner's attempt to change the subject. For example, assume that two people have been discussing sports for several minutes when one of them asks a question about politics. If the other person immediately says "I don't want to talk about this," the person who asked the question would not understand the other to have just expressed a desire to end the entire conversation. Rather, the questioner would understand that he could go back to talking about sports or could try another topic, but that his companion did not wish to talk about politics. The same applies here. Because Smith had been freely answering Detective Guy's questions about the van for more than 15 minutes before Guy brought up the robbery, Guy would not have understood Smith's statement about not wanting to talk "about this" as meaning that Smith was no longer willing to answer questions about the van or other topics and that he wanted the interrogation to end.

Moreover, nothing that Smith said after "I don't want to talk about this" suggests that Detective Guy should have understood him to be invoking his right to cut off further questioning on all topics. In the same breath that Smith said that he did not want to talk "about this," he also said "I don't know nothing about this." As the Wisconsin Supreme Court recognized, Smith's stating that he did not know anything about "this" was a proclamation of innocence, not a request to remain silent. *Cummings*, 357 Wis. 2d at 27. Arguably, Smith's combining "I don't want to talk about this" with "I don't know

nothing about this" into a single expression created ambiguity as to whether he even wanted to cut off questioning about the robberies. At the very least, his statement that he knew "nothing about this" did not signal a desire to remain silent on all topics. Furthermore, Smith's saying that he knew nothing "about this" makes clear that when he used the word "this," he was using it to refer only to the robbery, not to the van or to the robbery and the van together. That is because Smith had just spent 15 minutes talking about the van, and thus he obviously knew quite a bit about it. So the only sensible interpretation of his statement "I don't want to talk about this. I don't know nothing about this" is that "this" meant the robbery.

As Smith continued his interjection, he again said "I don't know nothing" and then he added "See, look, I'm talking about this van. I don't know nothing about no robbery." These statements only reinforce the conclusion that Smith was, at most, refusing to answer questions about the robbery. Smith's stating that "I'm talking about this van" was clearly a reference to his willingness to give a statement about why he was caught with the stolen van. He then explained that he did not know anything about the robbery and thus implied that he could not answer any questions on that topic.

Before Detective Guy said anything other than "Hmmm?" or "Okay" to Smith's interjection, Smith added the following: "I don't want to talk . . . I don't know nothing about this, see. That's—I'm talking about this, uh, van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this." Once again, these statements do not express a desire to cut off questioning on all topics. Rather, at most, they express a desire to cut off questioning about the robbery, which was what Smith was referring to when he used words such as "this" and "this stuff."

Most of the arguments that Smith advances in his briefs depend on ignoring his use of the phrase "about this" or assuming that his use of that phrase did not affect the meaning of his interjection. For example, in his reply brief, Smith's attorney writes that "Mr. Smith's statement—'I don't want to talk about this'—unambiguously meant that he did not want to talk anymore." Reply Br. at 7. But, as I have explained, "I don't want to talk about this" does not mean "I don't want to talk anymore." The former expresses a desire to cease talking about a particular subject, while the latter expresses a desire to stop talking altogether. Thus, I reject Smith's attempt to equate these two statements.

Smith also argues that his use of the phrase "about this" necessarily was a reference to both the robberies and the van because the van was used in the robberies. Reply Br. at 3–4. However, as I have explained, Smith's also stating that he did not know anything about "this" makes clear that "this" referred to just the robberies, not to the van and the robberies, as Smith had just finished demonstrating that he knew quite a bit about the van. In any event, the van and the robberies could be discussed as separate topics even though the van was used in the robberies. Indeed, for the first fifteen minutes of the interrogation, Smith and Detective Guy talked about Smith's having been caught driving the stolen van without once mentioning that the van had been used to commit robberies. Perhaps Smith's making statements about the van necessarily implicated him in the robberies, but nonetheless the robberies and Smith's being caught in the van were separate events and thus could be discussed separately. So, when Smith said he did not want to talk "about this," the only reasonable interpretation is that he was making a distinction between the robbery that Detective

Guy had just brought up, on the one hand, and his being caught in the van, on the other. Smith was not expressing a desire to cut off questioning on all topics.

Smith also argues that the Wisconsin Supreme Court wrongly used "Smith's responses to the continued interrogation" to "cast doubt on his invocation of the right to silence," contrary to the Supreme Court's decision in *Smith v. Illinois*, 469 U.S. 91 (1984). Br. at 15. *Smith*, which involved the right to counsel, holds that "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." 469 U.S. at 92. In the right-to-silence context, *Smith* stands for the proposition that an accused's post-invocation responses to further interrogation may not be used to cast doubt on the clarity of his initial invocation of his right to cut off questioning. But here, as I have discussed, Smith's initial statement—"I don't want to talk about this"—was not an invocation of his right to cut off all further questioning. His later statements thus do not qualify as post-invocation responses to further interrogation.

Smith also contends that the Wisconsin Supreme Court unreasonably applied federal law when it faulted him "for intermingling a denial with his request to end questioning." Br. at 12. This is a reference to Smith's repeatedly stating during his interjection both that he did not want to talk "about this" and that he did not know anything about "no robbery" or "this" or "this stuff." As I mentioned earlier, Smith's saying in the same breath both that he did not want to talk about the robbery and that he did not know anything about the robbery arguably created ambiguity over what he meant: did he want questioning on the topic of the robbery to end, or was he simply informing the officer that he could not talk about the robbery because he was not

15

involved in it? Smith argues that there is nothing in the relevant Supreme Court cases "that prevents a suspect from denying an offense, then subsequently invoking the right to silence." Br. at 12. While this is true, it does not follow that when a suspect both expresses a desire to remain silent and denies the offense in the same breath, he has made an unambiguous invocation of his right to cut off questioning. In any event, even if Smith's statements of innocence were excised from his interjection, his remaining statements would not add up to an unambiguous invocation of his right to cut off questioning. That is because, as I have explained, Smith's statement "I don't want to talk about this" meant, at most, that he did not want to talk about the robberies.

My interpretation of Smith's statements should not be thought to imply that a suspect could never invoke his right to cut off questioning by stating "I don't want to talk about this." Depending on the context in which such a statement is uttered, it could unambiguously mean that the suspect does not want to answer any further questions. For example, assume that while Detective Guy was asking Smith questions about the stolen van, but before Detective Guy mentioned any robbery, Smith said "I don't want to talk about this." In this context, "this" would be a reference to the stolen van. And because the stolen van was the only subject of the interrogation up to that point, Smith's statement would arguably constitute an unambiguous invocation of his right to cut off further questioning. But in this case, because Smith said "I don't want to talk about this" in response to Detective Guy's first mentioning the robbery, his statement implied that he was at least willing to continue answering questions about the van. Thus, the statement was not an unambiguous invocation of Smith's right to cut off all questioning.

Finally, Smith argues that this case is similar to two other cases in which federal courts granted habeas relief to criminal defendants on the ground that their statements were admitted in violation of their right to cut off questioning. *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008); *Saeger v. Avila*, 930 F. Supp. 2d 1009 (E.D. Wis. 2013). In *Anderson*, the Ninth Circuit held that the state court had wrongfully used "'context' to transform an unambiguous invocation into open-ended ambiguity." 516 F.3d at 787. In that case, however, the suspect stated in response to a question that he "was through with this," that he wanted to be taken into custody, and that he "plead[ed] the [F]ifth." *Id.* at 786. These statements, the court held, together conveyed a clear desire to cut off further questioning, and no amount of "context" could create an ambiguity about what the statements meant. *Id.* at 787–88. The court also singled out the statement "I plead the Fifth" as being, on its own, an unambiguous invocation of the right to remain silent and cut off further questioning. *Id.* In the present case, the statements at issue are materially different from the statements in *Anderson*. Smith did not reference the Fifth Amendment or otherwise indicate that he wanted all questioning to cease. Instead, he merely declined to answer questions about the robbery. Thus, *Anderson* does not support Smith's argument that the Wisconsin Supreme Court unreasonably applied Supreme Court cases in deciding his appeal.

In *Saeger*, Judge Griesbach of this court granted a writ of habeas corpus to a criminal defendant who said during an interrogation "I got nothin[g] more to say to you. I'm done. This is over." 930 F. Supp. 2d at 1011. I think it is obvious that Saeger's statement is quite different from Smith's and unambiguously expresses a desire to cut off further questioning. Indeed, in *Saeger*, the state court did not doubt that, taking

17

Saeger's words at face value, he unambiguously invoked his right to end the interrogation. *Id.* at 1012–13. The reason the state court did not exclude the statement is that it viewed Saeger's invocation of the right to cut off questioning as a negotiating ploy designed to get the officers to make him a better deal. *Id.* at 1013. That is, the court looked behind the meaning of Saeger's words and examined Saeger's motive for invoking his right to remain silent. *Id.* at 1015 (explaining that state court found that "while Saeger's actual words were clear, *he did not really mean them*" (emphasis in original)). Judge Griesbach determined that, in refusing to take Saeger's words at face value, the Wisconsin court unreasonably applied federal law. *Id.*

The present case does not present the problem Judge Griesbach confronted in *Saeger*. The Wisconsin Supreme Court did not look past the plain meaning of Smith's statements and decide that he meant something different than what he said. Rather, the court simply recognized, correctly, that Smith did not use words that unambiguously indicated that he wanted to cut off further questioning.

In sum, I conclude that Smith did not unambiguously invoke his right to cut off further questioning. I therefore also conclude that the Wisconsin Supreme Court did not render a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

### III. CONCLUSION

For these reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing

18

required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 4th day of May, 2017.

s/ Lynn Adelman
LYNN ADELMAN
District Judge